UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE MANUEL FERNANDEZ, | Case No. 15-cv-05576-EMC |
| Petitioner, | |
| v. | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| S. FRAUENHEIN, | |
| Respondent. | |

## I.    INTRODUCTION

Jose Manuel Fernandez filed this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge his state court conviction for several sex offenses against a minor.  For the reasons discussed below, the Court denies the petition.

## II.    BACKGROUND

The reporting victim is referred to in the California Court of Appeal opinion as B. Doe and Doe.  Miss Doe lived in Gilroy with her mother and her four siblings.  Also living in the household was her stepfather, petitioner Jose Manuel Fernandez.  At the time of his arrest in April 2011, Mr. Fernandez was 26 years old.  At that same time, Miss Doe was 11 years old and nearing the end of sixth grade.  The California Court of Appeal described the evidence:

> According to Doe's friend Desiree, in fourth grade Doe came to school with three hickeys on her neck and told Desiree that defendant gave them to her.  Two years later, in early 2011, Doe reportedly informed Desiree in the school locker room that defendant would sexually touch Doe.  Specifically, Doe told Desiree that defendant would touch Doe's "boobs" and vagina, and would grab her hand and put it on his penis.

> On April 18, 2011, one of Doe's brothers mentioned to a social worker at school that defendant was allegedly having sex with Doe. The next day a social worker contacted Doe at school and Doe

disclosed that defendant had molested her. The social worker then contacted the police, who took Doe to a police station in Gilroy for an interview.

Before the police interviewed Doe on April 19, they convinced her to participate in a "pretext call," described by police detective Jason Smith as a monitored and recorded phone call between the victim and a suspect where the police provide guidance regarding questions to ask. The pretext call between Doe and defendant was in Spanish.[3] Doe stated in the call that she told a friend defendant was touching her. When Doe mentioned possibly telling her mother, defendant said "[n]o, honey ... you guys will get me in trouble" and told her "they can put me in jail." Defendant promised that "I'm not going to touch you anymore or anything" and asked her to tell her friend that she was lying or else the friend was going to "get me in trouble, and then who's going to take care of everybody?"

> Footnote 3: Although they were marked as evidence but never admitted, we rely on the English language translations of the pretext call and defendant's interrogation. We will discuss defendant's contentions related to the trial court's jury instructions on this point.

Detective Smith then interviewed Doe in English. Doe said defendant never touched her chest sexually but that when they were together in the family's house he would try to kiss her, touch her "private part," and grab her hand and make her "do stuff" to his penis. Doe told the detective she did not want to "touch it" and "always tried like to pull away...." Doe said she touched his penis three to four times and that he touched her private part four or five times. When asked when this would happen, Doe responded, "[l]ike at th[e] same time when he like, do all that other stuff." Doe explained that defendant would "just like start[ ] hugging me ... and then that's when he starts doing all the rest." Later she said "he would hold me and then he would like start doing himself too, he would, like, yeah." Doe indicated that the first incident of sexual touching occurred in second grade. The most recent incident had happened the previous month, when defendant pulled Doe's hair to make her stand up from her bed and then made her "get on top of him" as he lay on the couch. Regarding the frequency of sexual touching, Detective Smith asked her if it happened "[o]nce a month, once a year?," and Doe ambiguously responded "[y]eah, once, once or twice."

During Doe's interview, defendant arrived at the police station and was detained. Defendant was given a *Miranda* advisement (*Miranda v. Arizona* (1966) 384 U.S. 436) and was interrogated by Detective Smith and Officer Jesus Cortez, who acted both as a Spanish translator and as an interrogator. When asked about his interactions with Doe, defendant said he would sometimes hug her but that he did not "do it with bad intentions." Later defendant admitted touching Doe's "butt" on one occasion and that he might have also accidentally touched her vagina. After further questioning, defendant eventually said Doe touched his penis approximately three times over his pants and twice skin-to-skin. Defendant described that he would take her hand and place it on his

2

penis. He recalled that one such incident occurred in approximately February 2011.

Defendant also admitted touching Doe's vagina both over her clothes and skin-to-skin but said it "wasn't more than three times." Defendant recalled an incident in December 2010 when he touched Doe's vagina outside her clothes for three or four seconds and rubbed up and down. He recounted another incident in January 2011 where he touched Doe's vagina over her clothes in her bedroom. A third touching over clothing occurred one night in the living room while they were standing. Defendant said that he touched Doe's vagina at least one time skin-to-skin while they were standing in his bedroom.

At the end of the interrogation, Detective Smith told defendant that he would give him the opportunity to write Doe an apology letter. Defendant drafted two handwritten letters in Spanish, one to the mother and one to Doe. In the letter to Doe, he asked her to "forgive me for the bad that I was doing to you" and promised "it will never happen again."[4] In the letter to the mother, defendant said he "made a mistake with what I did with [Doe] but it never went through my mind to do anything to her," and promised the mother "[n]ever again will it happen again." Defendant was taken into custody after the interrogation.

> Footnote 4: We rely on the English language translations of the letters that were admitted into evidence at trial.

On April 20, Detective Smith and Detective Wes Stanford interviewed Doe's mother about her daughter's accusations. The mother did not mention the possibility of Doe recanting and also said nothing about Doe's propensity to make up stories. Doe's mother asked if they could drop the charges against defendant and expressed concern about her ability to pay bills without defendant in the home. The detectives offered to let the mother watch the recordings of Doe's interview and defendant's interrogation but she chose not to. . . .

In May 2011, Doe attended an overnight science camp with her friends Desiree and Daisy. Daisy recalled Doe talking at night in the cabin where the girls were staying about "getting raped" by defendant and that this conduct had been going on since the third or fourth grade. Daisy said Doe mentioned defendant "[g]rabbing her real hard and making her do stuff," and touching Doe's vagina "all the time when her mom would leave to go to her work, which was face painting." According to Desiree, Doe told the girls that when her mother would leave defendant at home with Doe he would touch her sexually, consistent with Doe's statements to Desiree in early 2011 in the locker room.

. . .

Several witnesses testified at trial for the prosecution. Doe recanted her allegations against defendant at trial. She admitted that she reported defendant's alleged actions to the police, Desiree, and Daisy, but maintained that she was lying during each of those

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

disclosures. On cross-examination by defense counsel, Doe confirmed she had also recanted at the preliminary hearing. When asked why she would make up these allegations, Doe claimed that she did so because defendant was too strict and did not allow her to go to parties with her friends. In addition to recounting Doe's disclosures regarding defendant, Desiree testified that Doe's mother approached her during a field trip in November 2011 and told her that the accusations against defendant were untrue.

The prosecution played video recordings of Doe's interview, the pretext call, and defendant's interrogation. The jury was provided with a transcript of each of the recordings. Before playing the recording of Doe's interview, the trial court admonished the jury: "Ladies and gentlemen, you're going to be receiving a copy of the transcript. It is not part of the transcript, that is not part of the evidence in the case. It is being provided to you to assist you in following along with the DVD that is the evidence in the case."

Unlike Doe's interview, the pretext call was in Spanish and the transcript contained a transcription in Spanish as well as a side-by-side translation into English. Gilroy Police Officer Eustaquio Rodriguez, a fluent Spanish speaker, testified that the translation was accurate. Before playing the pretext call recording, the court told the jury: "Ladies and gentlemen, the same admonition I gave you previously, the transcript is not evidence but is to assist you in listening to the tape." According to the prosecutor, defense counsel received a copy of the pretext call transcript "previously."

Like the pretext call transcript, the transcript of defendant's interrogation (which took place in English and Spanish) included both the Spanish transcription and an English translation. Officer Cortez, who assisted in the interrogation, testified to the accuracy of the translation. Before it was played the court informed the jury: "The same admonition, ladies and gentlemen." The transcripts were collected from the jury after the recordings were played and, although marked as exhibits, were never admitted as evidence.

Defense witnesses included Doe's mother, who testified that Doe had a tendency to make up stories and that Doe had recanted her allegations against defendant during a walk with her on the evening of April 19. The mother also said she never saw any hickeys on Doe's neck and that it was "very rare" for defendant to be home alone with the children. She stated neither she nor Doe ever received an apology letter from defendant. Two of defendant's relatives testified to defendant's good character.

Defendant also testified. He stated that he had a second grade education. He claimed he was referring to an innocent, non-sexual interaction with Doe during the pretext call. Regarding the interrogation, defendant maintained that the officers had told him that if he was unsure of an answer he "should say yes." He admitted pulling Doe's hair to get her out of bed in March 2011. When confronted on cross-examination with his statements during the interrogation, defendant confirmed he made the statements attributed to him but argued none of those statements was true. Similarly, defendant confirmed he had rubbed his crotch during the

4

interrogation to simulate what he did to Doe but said that he never actually rubbed Doe in that way.

Carl Lewis testified for the prosecution as an expert in Child Sexual Abuse Accommodation Syndrome (CSAAS), which he described as a series of conditions and behaviors exhibited by children who are victims of child molestation that might seem unexpected. Lewis stated the behavioral categories predicted by CSAAS are: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed, conflicted, or unconvincing disclosure of abuse; and (5) retraction.

*People v. Fernandez*, California Court of Appeal No. H038618, opinion filed February 18, 2015 ("Cal. Ct. App. Opinion") at 2-7.

Following the jury trial in Santa Clara County Superior Court, Mr. Fernandez was convicted of four counts of committing lewd or lascivious acts on a child (*see* Cal. Penal Code § 288(a)), and seven counts of committing lewd or lascivious acts on a child by force, violence, duress, menace, or fear of immediate and unlawful bodily injury (*see* Cal. Penal Code § 288(b)(1)). The trial court sentenced Mr. Fernandez to a total of 30 years in state prison.

Mr. Fernandez appealed. The California Court of Appeal affirmed his conviction in February 2015 in a reasoned decision. Docket No. 13-7 at 3. The California Supreme Court summarily denied his petition for review in May 2015. *Id.* at 75.

Mr. Fernandez then filed his federal petition for writ of habeas corpus. He asserted three claims: (1) his right to due process was violated because the evidence was insufficient to support one of the convictions under California Penal Code § 288(a); (2) his right to due process was violated because the evidence was insufficient to support six of the seven counts under California Penal Code § 288(b)(1); and (3) his rights to due process and trial by jury were violated when the jury was instructed that two Spanish-language recordings were the evidence and the accompanying transcripts were only to assist the jurors. The Court ordered Respondent to show cause why the petition should not be granted. Respondent has filed an answer to the petition. Mr. Fernandez has not filed a traverse, and the deadline by which to do so has long passed. The matter is now ready for decision.

### III.    JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Santa Clara County, California, which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

### IV.    STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'"  *Id.* at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). "When there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst*, 501 U.S. at 803. The presumption that a later summary denial rests on the same reasoning as the earlier reasoned decision is a rebuttable presumption and can be overcome by strong evidence. *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1605-06 (2016). Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default and applies to decisions on the merits. *Barker*, 423 F.3d at 1092 n.3. In other words, when the last reasoned decision is a decision on the merits, the habeas court can look through later summary denials to apply § 2254(d) to the last reasoned decision.

Section 2254(d) generally applies to unexplained as well as reasoned decisions. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Id.* at 102.

## V.   **DISCUSSION**

A.    <u>Sufficiency of the Evidence - § 288(a) Conviction Based on the Hickeys</u>

Mr. Fernandez challenges the sufficiency of the evidence to support one of his convictions under California Penal Code § 288(a). Specifically, he contends that the conviction "based solely on Desiree's claim that two years ago Doe had told her that [Mr. Fernandez] had given her hickeys" violated his right to due process. Docket No. 1 at 5. Mr. Fernandez argues that the testimony was not substantial evidence because it was uncorroborated and relayed information that Desiree had heard two years before trial. Docket No. 1-1 at 37. In Mr. Fernandez's view,

1    "Desiree's memory of a conversation two years ago should not be deemed to have the

2    trustworthiness of a child who had actually experienced such an act.  This is especially true here in

3    that Doe claimed to have been asleep at the time and there is nothing in Desiree's story confirming

4    what Doe actually knew."  *Id.; see also* Docket No. 1-1 at 8-9.

5        The California Court of Appeal rejected Mr. Fernandez's challenge to the sufficiency of

6    the evidence to support this conviction.  The appellate court identified the correct legal standard

7    for reviewing the sufficiency of the evidence to support a conviction, *i.e.*, a conviction will be

8    affirmed if "any rational trier of fact could have found the essential elements of the crime beyond

9    a reasonable doubt."  Cal. Ct. App. Opinion at 11 (citations and internal quotation marks omitted).

10   The appellate court also noted that the reviewing court does not reweigh the evidence or witness

11   credibility, and that the testimony of a single witness is sufficient to uphold a judgment.  *Id.*  With

12   regard to the § 288(a) conviction based on the hickeys, the California Court of Appeal explained:

13           Desiree testified she saw three hickeys on Doe's neck at school one
             day during fourth grade and that Doe told Desiree, "my step dad
14           gave me a hickey like when I was asleep." The jury could
             reasonably credit Desiree's testimony about what Doe told her over
15           the contrary testimony by Doe's mother, given Desiree's
             comparative impartiality and the lack of evidence that she had any
16           motivation to testify falsely. In contrast, Doe's mother
             acknowledged at trial that she had asked the detectives soon after
17           defendant's arrest if she could not press charges and had also
             expressed concern to them about not being able to pay bills without
18           defendant's help. The reliability of Desiree's testimony was further
             enhanced by the fact that she was not merely backing up her friend
19           Doe, but actually contradicting Doe's recanted version of events. A
             reasonable jury could therefore conclude that Doe was telling the
20           truth in her out-of-court statement to Desiree that defendant gave her
             hickeys.
21

22   Cal. Ct. App. Opinion at 14-15.

23        As the last reasoned decision from a state court, the California Court of Appeal's decision

24   is the decision to which § 2254(d) is applied.  *See Ylst*, 501 U.S. at 803-04; *Barker*, 423 F.3d at

25   1091-92.  Mr. Fernandez is entitled to habeas relief only if the California Court of Appeal's

26   decision was contrary to, or an unreasonable application of, clearly established federal law from

27   the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the

28   evidence presented.

8

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A court reviewing a conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt, but rather determines whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may a court conclude that the evidence is insufficient. *See id.* at 324. The "prosecution need not affirmatively 'rule out every hypothesis except that of guilt,'" and the reviewing federal court "'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Wright v. West*, 505 U.S. 277, 296-97 (1992) (quoting *Jackson*, 443 U.S. at 326).

"*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (per curiam) (citing *Jackson*, 443 U.S. at 319). "[O]n habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge" unless "the state court decision was objectively unreasonable." *Id.* at 2062 (internal quotation marks omitted).

The *Jackson* standard is applied to a crime as that crime is defined by state law. *Jackson*, 443 U.S. at 324 n. 16. California Penal Code § 288(a) makes it a felony to "willfully and lewdly commit[] any lewd or lascivious act. . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child."[1]

_____

[1] The jury instruction on the § 288(a) offenses stated, in relevant part:

1    Here, Mr. Fernandez does not contend that giving a child a hickey would not qualify as a

2    violation of § 288(a), and instead contends that Desiree's testimony was simply too little to

3    amount to sufficient evidence to prove the event occurred. The California Court of Appeal's

4    rejection of Mr. Fernandez's claim was not an unreasonable application of the *Jackson* standard.

5         There was conflicting evidence at trial about the hickeys. On the one hand, Desiree

6    testified that Miss Doe showed her several hickeys on Miss Doe's neck and stated that Mr.

7    Fernandez had caused those hickeys. Desiree, who was then 12 years old and in seventh grade,

8    gave the following testimony about the hickeys:

9         Q.    . . . When you were in the fourth grade, did she [Miss Doe]
         ever talk about her stepfather doing something to her?

10
11        A.    Giving her a hickey.

12        . . .

13    _____

14        To prove that the defendant is guilty of this crime, the People must
          prove that:

15
16        1A. The defendant willfully touched any part of a child's
              body either on the bare skin or through the clothing;

17        OR

18        1B. The defendant willfully caused a child to touch her own
              body, the defendant's body, or the body of someone else,
19            either on the bare skin or through the clothing;

20        2. The defendant committed the act with the intent of
              arousing, appealing to, or gratifying the lust, passions, or
21            sexual desires of himself or the child;

22        AND

23        3. The child was under the age of 14 years at the time of the
              act.

24
          The touching need not be done in a lewd or sexual manner. [¶]
25        Someone commits an act *willfully* when he or she does it willingly
          or on purpose. It is not required that he or she intend to break the
26        law, hurt someone else, or gain any advantage. [¶] Actually
          arousing, appealing to, or gratifying the lust, passions, or sexual
27        desires of the perpetrator or child is not required.

28    CT 468 (CALCRIM 1110).

Q.      What did she tell you exactly?  What do you recall her telling you about the hickey?

A.      The other day my step dad gave me a hickey like when I was asleep.

Q.      And did you see the hickey yourself when you were in the 4th grade?

A.      Yeah, it was three of them.

RT 157-58.  Desiree then pointed to indicate that there were two hickey marks on the left side of the neck and one hickey mark on the right side of the neck.  RT 158.

On the other hand, Miss Doe testified that she knew that a hickey was a little bruise on the neck from being kissed on the neck, that she did not remember showing any hickeys to Desiree in the 4th or 5th grade, and that she did not remember telling Desiree that her stepfather gave her hickeys.  RT 90-91.  Also, Miss Doe's mother testified that she had never seen any hickeys on Miss Doe's neck, even though she would have had an opportunity for observation since she combed Miss Doe's hair occasionally.  RT 382-83.

The conflict in the evidence does not show the evidence to be insufficient to support the conviction, as the California Court of Appeal reasonably concluded.  Indeed, this was the sort of credibility dispute that is for the jury to resolve.  The jury's verdict shows that the jury resolved the credibility dispute in favor of believing Desiree's testimony over that of Miss Doe and Miss Doe's mother on this point.  As the California Court of Appeal noted, Desiree had no motive to testify falsely, whereas Miss Doe's mother did have a motive to testify falsely: Miss Doe's mother stood to lose a breadwinner for the household if Mr. Fernandez was convicted.  Miss Doe had told the detective of several incidents where Mr. Fernandez had touched her while she was in bed sleeping or pretending to sleep, which was consistent with Desiree's testimony that Miss Doe said Mr. Fernandez gave her the hickeys while she was asleep.[2]  Miss Doe had not been asked about

---

[2] According to Miss Doe's statement to the detective, Mr. Fernandez approached her more than once while she was in bed asleep or pretending to be asleep.  *See* CT 268 ("one time I was asleep, and then all that I can remember is that he like, he came, he laid down with me, and he just like started doing stuff"), 269 ("He would, like, pick up my shirt and stuff, but I didn't want to, so I'd like, I would pretend that I'm, I'm asleep, so I would like move around," and he eventually left), 273 ("And once he told me if I wanted to kiss him, but I just went to sleep, like I would be asleep, so I would, I felt like if I would be like dreaming, so I was like talking I guess"), 280 (he would

1    the hickeys when she was questioned by the police, and at trial she testified that she did not

2    remember showing hickeys to Desiree or telling her that Mr. Fernandez gave her those hickeys.

3          However, Miss Doe's trial testimony could reasonably have been found not credible, as

4    she retracted almost everything she told the police even though Mr. Fernandez's statements to

5    police largely corroborated Miss Doe's statements to police about Mr. Fernandez's sexual abuse of

6    Miss Doe.  For example, both Miss Doe and Mr. Fernandez told police that she had touched his

7    penis several times, but at trial Miss Doe denied that happened.  It was the responsibility of the

8    jury -- and not the California Court of Appeal or this Court -- to decide whether (1) to credit

9    Desiree's testimony that supported an inference that Mr. Fernandez gave Miss Doe the hickeys, or

10   (2) to credit the testimony of Miss Doe, Miss Doe's mother, and Mr. Fernandez that tended to

11   show that Mr. Fernandez did not give Miss Doe the hickeys.  *See Jackson*, 443 U.S. at 326

12   (reviewing court must presume evidentiary conflict resolved in favor of prosecution); *Cavazos v.*

13   *Smith*, 565 U.S. 1, 7, 8 (2011) (where experts presented "competing views" as to the cause of

14   victim's death, and jury rendered a guilty verdict, "the Ninth Circuit plainly erred in concluding

15   that the jury's verdict was irrational, let alone that it was unreasonable for the California Court of

16   Appeal to think otherwise"); *see also People v. Watts*, 76 Cal. App. 4th 1250, 1259 (Cal. Ct. App.

17   1999) ("It is well settled in California that one witness, if believed by the jury, is sufficient to

18   sustain a verdict.")

19         Based on Desiree's testimony, a rational trier of fact could have found that Mr. Fernandez

20   committed a lewd or lascivious act on Miss Doe.  The California Court of Appeal's rejection of

21   Mr. Fernandez's due process challenge to the sufficiency of the evidence on this § 288(a)

22   conviction was not an unreasonable application of, or contrary to, any holding of the U.S.

23   Supreme Court. Mr. Fernandez is not entitled to the writ of habeas corpus on this claim.

24

25

26

27   hug her while she was "pretending to be asleep"), 285 ("He like wanted to touch me, but I like was
     pre-, I was like really asleep, so I kept on moving around.  So, and then he like pulled my hair, like
     off my bed, so I couldn't, like, get up").  Given Miss Doe's several statements about events that
28   began when she was asleep or pretending to be asleep, a rational trier of fact could have inferred
     that Miss Doe was not literally and continuously asleep when Mr. Fernandez gave her the hickeys.

B.     Sufficiency of the Evidence - Lewd And Lascivious Conduct By Use Of Force

California Penal Code § 288(b)(1) provides for an enhanced penalty when a lewd or lascivious act in violation of § 288(a) is committed "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person."[3]  Mr. Fernandez, who was convicted of six counts under § 288(b)(1), contends that the evidence was insufficient to support five of those six convictions for lewd and lascivious conduct by use of force.  (He does not challenge the sixth conviction under § 288(b)(1), in which the use of force consisted of pulling Miss Doe's hair to move her to another room to molest her.)

---

[3] The jury instruction on the § 288(b)(1) offenses stated, in relevant part:

> To prove that the defendant is guilty of this crime, the People must prove that:
>
> > 1A. The defendant willfully touched any part of a child's body either on the bare skin or through the clothing;
> >
> > OR
> >
> > 1B. The defendant willfully caused a child to touch her own body, the defendant's body, or the body of someone else, either on the bare skin or through the clothing;
> >
> > 2. In committing the act, the defendant used force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the child or someone else;
> >
> > 3. The defendant committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child;
> >
> > AND
> >
> > 4. The child was under the age of 14 years at the time of the act.
>
> Someone commits an act *willfully* when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage. [¶]  Actually arousing, appealing to, or gratifying the lust, passions, or sexual desires of the perpetrator or child is not required.
>
> The *force* used must be substantially different from or substantially greater than the force needed to accomplish the act itself.

CT 467 (CALCRIM 1111).  The instruction also defined duress, menace and fear, but those are not relevant to the habeas issues here.

The California Court of Appeal rejected Mr. Fernandez's claims. Under California law, the "force" necessary to support a conviction under § 288(b) must be "'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.'" Cal. Ct. App. Opinion at 15 (quoting *People v. Soto*, 51 Cal. 4th 229, 242 (Cal. 2011)).

> Such force "includes acts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves." (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1005, citing *People v. Babcock* (1993) 14 Cal.App.4th 383, 385 & 388 [finding sufficient evidence of force where the defendant grabbed the victim's hand and placed it on his crotch].) Defendant argues there was an insufficient showing of force or duress to support counts one through six.
>
> During her interview, Doe stated that defendant would grab her hand and make her "do stuff" to his penis and that she "always" tried to pull away. Later, Doe said "he would hold me and then he would like start doing himself too...." Consistent with Doe's statements, Daisy testified that Doe told her about defendant "[g]rabbing [Doe] real hard and making her do stuff" and that she thought the conduct started in "third or fourth" grade. From this evidence, the jury could reasonably conclude that on at least seven occasions (including the hair pulling incident) defendant committed a lewd or lascivious act upon or with Doe's body by use of force "'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.' [Citation.]" (*Soto, supra*, 51 Cal.4th at p. 242.)

Cal. Ct. App. Opinion at 15-16.

As mentioned in Section A, above, a court reviewing a challenge to the sufficiency of the evidence to support a conviction must decide whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319. This being a federal habeas action reviewing a state court conviction, relief is available only if the state court's rejection of the sufficiency of the evidence challenge was "objectively unreasonable." *Coleman v. Johnson*, 132 S. Ct. at 2062.

As the last reasoned decision from a state court, the California Court of Appeal's decision is the decision to which § 2254(d) is applied. *See Ylst*, 501 U.S. at 803-04; *Barker*, 423 F.3d at 1091-92. Mr. Fernandez is entitled to habeas relief only if the California Court of Appeal's decision was contrary to, or an unreasonable application of, clearly established federal law from the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the

1  evidence presented.

2      The California Court of Appeal's rejection of the insufficient-evidence claim was not

3  objectively unreasonable.  Miss Doe gave the following statements to police detective Smith:

4          Smith: Okay.  Tell me about a time where you touched him.

5          [Doe]: He would like make me touch him, like it's his, everything
6                 off and stuff, so--

7          Smith: Tell, tell me about that.

8          [Doe]: He would *grab my hand and he would like, put my*
                  *hand on his, um, private,* and then he would like *make me do*
9                 *stuff to it.*

10         Smith: Okay.  Do you know what the word "penis" means?

11         [Doe]: Yeah.

12         Smith: Okay.  Is that the same as his private, or it different?

13         [Doe]: The same.

14         Smith: Okay.  So tell me, tell me about a time when that happened.

15         [Doe]: I don't know, like he did that, and then I just felt weird, *like I*
                  *kinda didn't wanna like touch it*, but--

16         Smith: Okay.

17         [Doe]: *I always tried like to pull away, but--*

18         Smith: When would this happen?

19         [Doe]: *Like at this same time when he like, do all that other stuff.*

20         Smith: Okay.  When he, and what is 'doing all that other stuff'?

21         [Doe]: Huh?

22         Smith: When you said 'when he would do all that other stuff,' is that
23                what we talked about before, when he would touch you and,
                  on your private?

24         [Doe]  Yeah.

25  CT 273-74 (emphasis added); *see also* RT 222 (DVD of interview played for the jury).  Earlier in

26  the interview, Miss Doe stated:  "He would touch me on my private, but I would have my like

27  clothes on and stuff."  CT 270.  She pointed to her crotch area to show where her "private" was.

28  *Id.*  When asked how many times these touchings happened, Miss Doe responded:  "I would say

                                            15

like, about three to four, I guess."  CT 275.  She also stated again that "he just like *grabbed my hand out of nowhere, and then he just like made me touch him*."  CT 275.  Later in the interview, she said she thought Mr. Fernandez touched her "private" four or five times.  CT 277-78.

The jury could infer from Miss Doe's statements during police questioning that there were at least three separate incidents where Mr. Fernandez used force on Miss Doe to commit at least six lewd acts on her.  Under California law, Mr. Fernandez touching Miss Doe's genital area, and Mr. Fernandez making her touch his penis, were two offenses even if they occurred during the same session of abuse.[4]  As the California Court of Appeal explained, the "California Supreme Court has consistently rejected the reasoning of defendant's argument that he cannot be convicted for more than one count per incident because Doe testified the touching occurred at the 'same time.'"  Cal. Ct. App. Opinion at 12 (citing *People v. Scott*, 9 Cal. 4th 331 (Cal. 1994), and *People v. Harrison*, 48 Cal. 3d 321 (Cal. 1989))  A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Hicks v. Feiock*, 485 U.S. 624, 629 (1988).

The jury rationally also could conclude that the lewd acts were committed with the force necessary for six convictions under § 288(b) based on Miss Doe's statements that, on those three or four occasions, Mr. Fernandez "grabbed" her hand and "made [her] touch him," that he did this at the same time he was touching her "private," and that she "always tried" to "pull away" when Mr. Fernandez made her touch his penis.  Although the force of grabbing Miss Doe's hand and making her touch his penis may not have caused physical harm to her, it was beyond that needed to accomplish the lewd act of her touching his penis or him touching her genital area and was sufficient force to support a jury's guilty verdict for six § 288(b)(1) offenses.  In *People v. Alvarez*

---

[4] The force used does not have to be part and parcel of the lewd acts, *i.e.*, the defendant doesn't have to, *e.g.*, forcibly hold the child's hand on private parts.  It can be the use of force to draw the child to the defendant or to keep the child from pulling away from a defendant committing lewd acts, as occurred here.  Also, Fernandez did not argue there were three rather than six forcible lewd acts, and instead argued that the physical acts described did not amount to sufficient force for a § 288(b)(1) conviction.

178 Cal. App. 4th 999 (Cal. Ct. App. 2009), the court explained that "a 'defendant may fondle a child's genitals without having to grab the child by the arm and hold the crying victim in order to accomplish the act. Likewise, an assailant may achieve oral copulation without having to grab the victim's head to prevent the victim from resisting.' Lewd conduct of this sort is punishable in and of itself. Therefore, it stands to reason that the force requirement will be deemed satisfied when the defendant uses any force that is 'different from and in excess of the type of force which is used in accomplishing similar lewd acts....' [¶] According to the majority of courts, this includes acts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves." *Id.* at 1004-05 (citations omitted); *see, e.g., People v. Cochran,* 103 Cal. App. 4th 8, 13 (2002) ("if the defendant grabs or holds a victim who is trying to pull away, that is the use of physical force above and beyond that needed to accomplish the act"); *People v. Babcock,* 14 Cal. App. 4th 383, 386-87 (Cal. Ct. App. 1993) (grabbing victim's hand and making her touch defendant's genitals constituted sufficient force for § 288(b) conviction because these acts are not necessarily elements of the lewd acts); *People v. Pitmon*, 170 Cal. App. 3d 38, 48 (Cal. Ct. App. 1985) (defendant grabbed victim's hand, placed it on his own genitals, and rubbed himself with the victim's hand; "[t]here can be little doubt that defendant's manipulation of Ronald's hand as a tool to rub his genitals was a use of physical force beyond that necessary to accomplish the lewd act.")

The California Court of Appeal's rejection of Mr. Fernandez's due process challenge to the sufficiency of the evidence on six of the seven § 288(b)(1) convictions was not an unreasonable application of, or contrary to, any holding of the U.S. Supreme Court. Mr. Fernandez is not entitled to the writ of habeas corpus on this claim.

C.   Spanish-Language Evidence

Two Spanish-language recordings were used at trial. The trial court mistakenly instructed the jury that the evidence was the Spanish-language recordings, rather than the English-language translations of those recordings. Mr. Fernandez contends that this erroneous instruction violated his state law rights, and his rights to a jury trial and due process. He also urges that the error was structural error, requiring automatic reversal.

1.  Background

    a.  Recorded Evidence In California Courts

English-language and foreign-language recordings are supposed to be handled differently in trial in a California court. "When an English language recording is admitted into evidence and played for the jury, the recording itself constitutes the evidence to be considered by the jury and any transcription is considered merely an aid. However, when a recording is in another language, the proper evidence for the jury to consider is the translation of the recording and not the original non-English version." Cal. Ct. App. Opinion at 8 (citations omitted).

A pattern jury instruction currently is recommended for use in trials at which foreign-language recordings are played. That instruction provides, in relevant part:

> You (may/are about to) hear a recording [that is partially] in a foreign language. You will receive a transcript with an English language translation of that recording. [¶] You must rely on the transcript, even if you understand the language in the recording. Do not share your own translation with other jurors. Please write a note to the clerk or bailiff if you believe the translation is wrong. [If the recording is partially in English, the English parts of the recording are the evidence.]

CALCRIM 121 (2016 version) (brackets and parentheses in source).

    b.  The Problem at Mr. Fernandez's Trial

Three recordings were played at Mr. Fernandez's trial. First, the prosecution introduced a video recording of detective Smith's interview of Miss Doe, which had been conducted in English. When the DVD of the interview was played, jurors received a written transcript of the interview. The trial court instructed that the transcript of the interview "is not part of the evidence in this case. It is being provided to you to assist you in following along with the DVD that is the evidence in this case." RT 222. (This piece of evidence is not in dispute, and only is described because it gives context to the trial judge's comments on the Spanish-language recordings next described.)

Second, the prosecution introduced a tape-recording of Miss Doe's pretext call to Mr. Fernandez. The telephone call was in Spanish. When the tape was played at trial, jurors received a written transcript of the call, with both the Spanish-language words and an English translation of

18

the words spoken. CT 298-304.[5] The trial court stated to the jury: "Ladies and gentlemen, the same admonition I gave you previously, the transcript is not evidence but is to assist you in listening to the tape." RT 282.

Third, the prosecution introduced a videotape of the police interrogation of Mr. Fernandez. The interrogation was in Spanish. When the videotape was played at trial, jurors received a written transcript of the interrogation, with both the Spanish-language words and an English translation of the words spoken. CT 305-439. As these transcripts were being passed out to jurors, the trial court stated to the jury: "The same admonition, ladies and gentlemen." RT 295.

The written transcripts of the second and third recordings were not admitted as evidence. Outside the presence of the jury, the trial court observed that the transcripts "are accompanying the exhibits but are not otherwise in evidence." RT 350.

The trial court did *not* give any instruction like the CALCRIM 121 instruction block-quoted above. After instructing the jury on the law, the court gave some instructions on the deliberations, including this instruction about the recordings:

> As I said, the exhibits will be coming in [with] you into the jury room. That will include the tapes, the CDs and DVDs. And there will be a laptop that you'll be able to play them on for your use if you wish. When and if you wish to review those, you may ask for the transcripts. The transcripts, as I remind you, are not in evidence. You may have the transcripts to assist you while you're watching or listening to any of the tapes if you wish; just ask for them and they will be provided and then you will need to give them back.

RT 619-20.

Ten minutes into the deliberations, the jury requested and received transcripts of the three recordings. CT 451, 453.

---

[5] The transcript had three columns, with the speaker's name in the first column, the Spanish words spoken in the second column, and the English translation of those words in the third column. The first two entries illustrate the format used:

| SPEAKER | SPANISH | ENGLISH |
|---|---|---|
| Jose [Fernandez] | Que paso? | What's up? |
| [Miss Doe] | Hey pa'? | Hey Dad? |

CT 299.

c.      <u>California Court of Appeal's Decision</u>

On appeal, Mr. Fernandez argued that the erroneous instruction that the Spanish-language recordings were the evidence violated his rights under state and federal law, and that the error was structural error.

The California Court of Appeal rejected Mr. Fernandez's claim that reversible error had occurred. First, the appellate court noted that the State had "concede[d] that the court mistakenly instructed the jury by repeating the same admonition for the Spanish-language recordings" that was proper for the English-language recording. Cal. Ct. App. Opinion at 9. Next, the appellate court rejected Mr. Fernandez's argument that the error was a structural error, explaining that the error was "more akin to an evidentiary rather than structural error, and therefore does not require automatic reversal." *Id.*

Then, the appellate court held that there was no federal constitutional violation:

> Defendant also asserts the instructional error "deprived [him] of his federal due process rights to a fair trial under the Fourteenth Amendment of the United States Constitution because the verdict was not based upon the unanimous verdict of twelve jurors who heard and saw exactly the same evidence, at the same time." (Citing *Neder v. United States* (1999) 527 U.S. 1, 8 (*Neder*).) In *Neder*, the jury instructions omitted an element of the charged offense, which the court found violated the defendant's Sixth Amendment jury trial guarantee. (*Neder*, at pp. 8, 12.) Noting that "a 'very limited class of cases'" are subject to automatic reversal, the court rejected the defendant's claim that the error was structural and concluded that the error was reversible unless the prosecution could show it was harmless beyond a reasonable doubt. (*Id.* at pp. 8, 16, citing *Chapman v. California* (1967) 386 U.S. 18.) Unlike the faulty instruction in *Neder*, here defendant does not claim the instructions omitted any element of the charged offenses and he does not affirmatively show how the error otherwise violated any federal constitutional protections.

Cal. Ct. App. Opinion at 9-10.

Finally, the California Court of Appeal applied the state law standard for evaluating errors under California law, and found that the error was harmless. Where a "misdirection of the jury" violates California law but does not result in the violation of a federal constitutional right, the judgment will not be set aside "'unless it appears "reasonably probable" the defendant would have achieved a more favorable result had the error not occurred.'" *Id.* at 10 (quoting *People v.*

*Breverman*, 19 Cal. 4th 142, 149 (Cal. 1998)); *see also Breverman*, 19 Cal. 4th at 184-85 (Mosk, J., dissenting) (explaining that, in determining whether an error was prejudicial, the "reasonable probability" test usually applies to errors under California law, whereas the harmless-beyond-a-reasonable-doubt test "generally applies to error violative of the United States Constitution").

> On this record, we see no reasonable probability that defendant would have achieved a more favorable result with a proper jury instruction. The record discloses no evidence that any of the jurors spoke Spanish, much less that any juror retranslated the recordings. The jury's request for the transcripts rather than the recordings during deliberation suggests that the jurors based their decision on the English translations provided in the transcripts. Further, Officers Rodriguez and Cortez testified to the accuracy of the translations of the pretext call and defendant's interrogation, respectively, and defense counsel did not lodge any objections related to their accuracy.

Cal. Ct. App. Opinion at 10.

To summarize, the California Court of Appeal found that the error was not structural error, there was no federal constitutional violation, and the state law error was harmless error.

As the last reasoned decision from a state court, the California Court of Appeal's decision is the decision to which § 2254(d) is applied. *See Ylst*, 501 U.S. at 803-04; *Barker*, 423 F.3d at 1091-92. Mr. Fernandez is entitled to habeas relief only if the California Court of Appeal's decision was contrary to, or an unreasonable application of, clearly established federal law from the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented.

### 2. Analysis Of Federal Constitutional Claim

#### a. The Error Was Not A Structural Error

There are two broad types of constitutional errors that may occur during the course of a criminal prosecution: trial errors and structural errors. A trial error is an error that is subject to a harmlessness analysis. A structural error is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). Where a criminal proceeding is undermined by a structural error, the "criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence," and the defendant's conviction must be reversed. *Id.* These cases are rare and require

21

automatic reversal.  *Washington v. Recuenco*, 548 U.S. 212, 218 (2006).

The list of errors that the U.S. Supreme Court has found to be structural errors is short. *Campbell v. Rice*, 408 F.3d 1166, 1172 (9th Cir. 2005).  Those errors are: a defective instruction on the beyond-a-reasonable-doubt standard, *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993); the unlawful exclusion of a member of the defendant's race from a grand jury, *Vasquez v. Hillery*, 474 U.S. 254, 264 (1986); the denial of the right to a public trial, *Waller v. Georgia*, 467 U.S. 39, 49-50, 49 n.9 (1984); a violation of the right to self-representation at trial, *McKaskle v. Wiggins*, 465 U.S. 168, 177-78 n.8 (1984); the deprivation of the right to counsel, *Gideon v. Wainwright*, 372 U.S. 335, 344-45 (1963); and a trial by a biased judge, *Tumey v. Ohio*, 273 U.S. 510, 531-32 (1927).  *See Campbell*, 408 F.3d at 1172.  In the decade since *Campbell*, the Supreme Court has found only two other errors to be structural errors:  a judge's unconstitutional failure to recuse himself from a multi-member appellate panel, *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1909 (2016); and the denial of an individual's right to counsel of choice, *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006).

Mr. Fernandez argues that the instructional error violated his right to due process and jury trial right because the instructional error created the possibility that some jurors may have given a different meaning to the Spanish-language recordings.  The alleged constitutional error is not a structural error.  There was no instructional error that, *e.g.*, lowered the burden of proof to less than proof-beyond-a-reasonable-doubt.  *See Sullivan*, 508 U.S. at 281.  *Cf. Neder v. United States*, 527 U.S. 1, 8-9 (1999) (instruction that omits an element of the offense is subject to harmless-error analysis).  Here, the instructional error pertained to two pieces of evidence; erroneously indicating that the two English language transcripts provided to and reviewed by the jury were not evidence when in fact they should have been treated as such, and that the Spanish-language recordings were the evidence.  The instructions did not fundamentally impair the framework of the trial.  Like most other instructional errors, this is a trial error subject to harmless-error analysis.  *See Calderon v. Coleman*, 525 U.S. 141, 145, 147 (1998) (once a court finds that a constitutional error occurred in the jury instructions, it must make "further inquiry" and cannot grant habeas relief unless the court finds "that the error, in the whole context of the particular case, had a substantial and injurious

effect or influence on the jury's verdict").

Even if the error at Mr. Fernandez's trial is viewed as the jury potentially being exposed to extrinsic evidence, such as a Spanish-speaking juror's interpretation of the meaning of the recording, the petitioner would be entitled to habeas relief only if it can be established that the exposure to the extrinsic evidence had "'substantial and injurious effect or influence in determining the jury's verdict.'" *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). The California Court of Appeal correctly determined that the claimed federal constitutional violations were trial errors subject to a harmless-error analysis, rather than structural errors. In any event, its rejection of the structural error analysis was not an unreasonable application of clearly established federal law; no Supreme Court decision has ever held such an instructional error constitutes structural error. *See Glebe v. Frost*, 135 S. Ct. 429, 430 (2014) (Ninth Circuit erred in holding that state supreme court unreasonably applied clearly established federal law when state supreme court failed to classify the trial court's restriction on closing argument as structural error; even if the trial court violated the U.S. Constitution, it was not clearly established that the restriction on closing argument ranked as structural error).

    b.    The Error Was, At Most, A Harmless Constitutional Error

To obtain federal habeas relief for an error in the jury instructions, a petitioner must show that the error "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). "'A single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'" *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (quoting *Boyde v. California*, 494 U.S. 370, 378 (1990)). *Cf. Neder v. United States*, 527 U.S. 1, 8-9 (1999) (instruction that omits an element of the offense is subject to harmless-error analysis). "Even if there is some 'ambiguity, inconsistency, or deficiency' in the instruction, such an error does not necessarily constitute a due process violation." *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009) (quoting *Middleton v. McNeil*, 541 U.S. at 436). Where an ambiguous or potentially defective instruction is at issue, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates

23

the Constitution in contrast to situations where the instruction is only erroneous under State law.

*Estelle*, 502 U.S at 72 & n.4; *Boyde*, 494 U.S. at 380. *Cf. Cupp v. Naughten*, 414 U.S. 141, 146

(1973) ("[E]ven substantial unanimity among federal courts of appeals that the instruction in

question ought not to be given in United States district courts within their respective jurisdictions

is not, without more, authority for declaring that the giving of the instruction makes a resulting

conviction invalid under the Fourteenth Amendment. Before a federal court may overturn a

conviction resulting from a state trial in which this instruction was used, it must be established not

merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it

violated some right which was guaranteed to the defendant by the Fourteenth Amendment.")

The Sixth Amendment guarantees the criminally accused the right to a fair trial by a panel

of impartial jurors. U.S. Const. amend. VI; *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961). The

jury's verdict "'must be based upon the evidence developed at the trial.'" *Turner v. Louisiana*,

379 U.S. 466, 472 (1965). "In the constitutional sense, trial by jury in a criminal case necessarily

implies at the very least that the 'evidence developed' against a defendant shall come from the

witness stand in a public courtroom where there is full judicial protection of the defendant's right

of confrontation, of cross-examination, and of counsel." *Id.* at 472-73. Juror exposure to

extraneous influences is considered juror misconduct.

The California Court of Appeal's rejection of the federal constitutional claim was not

contrary to, or an unreasonable application of, clearly established federal law. The California

Court of Appeal determined that Mr. Fernandez did not claim that the erroneous instruction

omitted any element of the charged offenses and did not "affirmatively show how the error

otherwise violated any federal constitutional violations." Cal. Ct. App. at 10. This is a reasonable

view of the record. Mr. Fernandez's only argument is that the instruction created the *possibility*

that one or more jurors *might* independently translate the recordings, but he does not demonstrate

that such translating actually occurred or that there is even a reasonable likelihood of such an

occurrence. Mr. Fernandez does not show that any juror did his own translation, or even that any

juror spoke Spanish. And, contrary to Mr. Fernandez's argument, the jurors were not instructed to

"provide[] their own interpretation for themselves." Docket No. 1 at 45. Thus, while he argues

that there was a possibility for juror misconduct *if* one or more jurors did independent translations of the recordings, he does not show that any juror did do a translation. Mr. Fernandez has not identified, nor has the Court located, a Supreme Court case holding that the mere possibility of juror misconduct establishes a violation of the defendant's constitutional right to trial by jury. *Turner* explains that the constitutional right to trial by jury is violated when the verdict is based on extraneous evidence, and does not stand for the proposition that the mere potential for exposure (as opposed to actual exposure) to extraneous evidence violates the right. *See* 379 U.S. at 472.

Importantly, here the accuracy of the transcripts provided to the jury was not disputed at trial, on appeal or here. Mr. Fernandez does not identify a single incorrect translation or any ambiguous phrase that might have been translated differently *if* there had been any Spanish-speaking juror who took it upon himself/herself to separately translate the document. The fact that Mr. Fernandez does not identify any inaccuracy or ambiguity in the transcript further supports the view that there was no reasonable likelihood that one or more jurors did an independent translation different from the transcript. Jurors would be unlikely to undertake an independent translation if problems were not perceived in the written translation provided by the prosecution.

Mr. Fernandez also overstates the problem when he argues that the "jurors who did not speak Spanish heard a jumble of meaningless sounds and would have been understandably predisposed" to let fellow jurors translate. Docket No. 1 at 46. This argument ignores that the jurors asked for and obtained the transcripts within ten minutes of commencing deliberations. There is no reasonable likelihood that jurors relied on other jurors (assuming there were any) who spoke Spanish to provide independent translations of the two recordings when they had in hand the prepared transcripts. Indeed, the fact that the jurors asked for the transcripts just ten minutes into deliberations suggests there were no jurors interested in independently translating the recordings.

For these reasons, it was not contrary to or an unreasonable application of clearly established Supreme Court precedent for the California Court of Appeal to conclude that the misinstruction to jurors that the Spanish-language interview (rather than the English translation of it) was the evidence did not violate Mr. Fernandez's constitutional rights.

If a constitutional error is found in the jury instructions or juror exposure to extraneous influences, the federal habeas court also must determine whether that error was harmless by looking at the actual impact of the error. *Calderon v. Coleman*, 525 U.S. at 146-47; *Sassounian*, 230 F.3d at 1108. The habeas court must apply the harmless-error test set forth in *Brecht*, 507 U.S. at 623, and determine whether the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (quoting *Brecht*, 507 U.S. at 623).

Assuming arguendo that the erroneous instruction resulted in a violation of Mr. Fernandez's constitutional rights, that error did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623.[6]

First, although the jury was misinstructed that the Spanish-language recordings rather than the transcripts thereof were the evidence, the recordings had been played for the jurors at trial while they had the transcripts in hand with an instruction that the transcripts were being provided to assist jurors in following along with the recordings. The jury also had both the recordings and the English-language translations of those documents in the jury room as they deliberated. Further, when Mr. Fernandez testified, he was questioned at length about his statements in the recorded interrogation and conceded that he did tell the police that he had touched Miss Doe and she had touched him, although he denied that his statements to the police were true. RT 448-61.

Second, apart from Mr. Fernandez's self-incriminating statements in the interrogation and in the pretext call recordings, there was significant other evidence against him. Mr. Fernandez had drafted letters of apology to Miss Doe and Miss Doe's mother after his interrogation. In the letter to Miss Doe, Mr. Fernandez asked her to "forgive me for the bad that I was doing to you" and promised "it will never happen again." Cal. Ct. App. Opinion at 4. In the letter to Miss Doe's mother, Mr. Fernandez said he "made a mistake with what I did with" Miss Doe but it would

---

[6] In doing the harmless error analysis, this Court does not give § 2254(d) deference to the California Court of Appeal's analysis because that court did not decide whether a federal constitutional violation was harmless. Rather, the California Court of Appeal decided that (a) the state law error was harmless under the standard for state law errors, and (b) there was no federal constitutional error so it did not decide whether such an error was harmless.

never happen again.  *Id.*

Miss Doe's statement to the police graphically and strongly incriminated Mr. Fernandez. Miss Doe recanted most of the substance of that statement at trial, but her recantation was not very credible and could well have been the product of pressure put on her by her family.  *See, e.g.,* RT 492-93 (sergeant Stanford testifies that Miss Doe's mother did not dispute that molestations had occurred, but did complain to him about not being able to pay the bills and possibly having to move); RT 493 (sergeant Stanford testifies that Miss Doe's mother asked him "what if she didn't want to press charges"); RT 401-02 (Miss Doe's mother testifies that prosecutor offered to show her the evidence against Mr. Fernandez but she declined to look at it because she was upset by prosecutor's tone); *but see* RT 383-84 (Miss Doe's mother testifies that she did not tell Miss Doe she wanted the family to get back together and get Mr. Fernandez out of jail).  Miss Doe testified that she made up her accusations to the police because Mr. Fernandez "was too strict and did not allow her to go to parties with her friends."  Cal. Ct. App. Opinion at 5.  But long before speaking to the police, Miss Doe had told several friends about Mr. Fernandez's inappropriate touching, and two of those friends testified at trial.  Miss Doe's friend, Desiree, had not only heard Miss Doe describe Mr. Fernandez's lewd acts, but also had seen hickeys on Miss Doe's neck a couple of years before trial when Miss Doe reported to her that Mr. Fernandez had given hickeys to Miss Doe.

Third, the jury deliberations were brief.  The jury deliberated for less than four hours after six days of trial, and sent no questions to the court other than to ask for the transcripts.  *See* CT 450-51, 495.  "'Longer jury deliberations weigh against a finding of harmless error because lengthy deliberations suggest a difficult case.'"  *United States v. Lopez*, 500 F.3d 840, 846 (9th Cir. 2006) (quoting *United States v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001)); *see, e.g., id.* at 846 (2.5 hour jury deliberations in illegal reentry case suggested any error in allowing testimony or commentary on defendant's post-arrest silence was harmless); *Velarde-Gomez*, 269 F.3d at 1036 (4-day jury deliberations supported inference that impermissible evidence affected deliberations).  The jury returned verdicts on all eleven counts against Mr. Fernandez and did so in less than four hours.  The short deliberations suggest the jury did not struggle with this case and

27

weigh in favor of finding that any error was harmless.

For these reasons, this Court concludes that (1) the California Court of Appeal's determination that the incorrect instruction about the Spanish-language recordings did not violate Mr. Fernandez's federal constitutional rights was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, and (2) even assuming arguendo that the incorrect instruction resulted in a federal constitutional violation, the error did not have a substantial and injurious effect on the jury's verdict. Mr. Fernandez is not entitled to the writ on this claim.

D.      No Certificate Of Appealability

A certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a certificate of appealability is **DENIED**.

## VI.      CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** on the merits. The Clerk shall close the file.


**IT IS SO ORDERED**.


Dated: April 13, 2017

_____
EDWARD M. CHEN
United States District Judge